## No. 12,618.

GEORGE C. HEMINGWAY VS. NEW ORLEANS CITY & LAKE RAILROAD COMPANY.

The proof disclosing that the driver of a small pleasure wagon had halted his team within a few feet of a street electric car track at the intersection of Carrollton avenue and Canal street, in the city of New Orleans, to wait for a steam train and an electric street car to pass, and suddenly put his horse and wagon in motion for the purpose of crossing the track, in front of another electric car which was rapidly approaching, and only a short distance away and within easy open view—*Held:* That the street car company, its agents and employees were not guilty of culpable negligence which renders the defendant liable for the damages resulting from a collision between the car and wagon.

APPEAL from the Civil District Court for the Parish of Orleans. *King, J.*

O. B. *Sansum* (*Fenner, Henderson & Fenner*, of Counsel) for Plaintiff, Appellant.

*Denègre, Blair & Denègre* for Defendant, Appellee.

Argued and submitted March 7, 1898.
Opinion handed down May 30, 1898.
Rehearing refused June 29, 1898.

The opinion of the court was delivered by

WATKINS, J.  The plaintiff prosecutes this suit in his own right and that of his two minor children against the defendant for twenty-five thousand dollars as the amount of the damages they sustained in a collision between one of the electric cars of the company and a wagon driven by the plaintiff on the afternoon of the first of March, 1895, at or near the intersection of Canal street with Carrollton avenue, the two children being occupants of the wagon at the time.

On the trial there was judgment in favor of the defendant rejecting the plaintiff's demands, and from that judgment the latter has appealed.

The reasons assigned by the judge *a quo* for his judgment are brief and unique, and we quote them, viz.:

" Considering the evidence in this case and the opinions of the Supreme Court in the case of Snider vs. Railroad Co., 48 An. 1; Perez vs. Railroad Co., 47 An. 1391, and Schwartz vs. Railroad Co., 30 An. 18, judgment is rendered in favor of the defendant."

In his petition the plaintiff particularizes the damages claimed thus, viz.: (1) For the pain and suffering of his minor son, Ira, three thousand dollars, and for the loss of his arm twenty thousand dollars; (2) for the pain and suffering of his minor son, George, five hundred dollars; (8) and for the personal injuries, pain and suffering he sustained one thousand five hundred dollars.

The following is a brief synopsis of the statement of the plaintiff's case as it appears in his petition, viz.:

That at about 3 o'clock in the afternoon he and his two little boys were driving out Canal street in a one-horse wagon on the lower or down town side—the plaintiff's purpose being to turn into Carrollton avenue as soon as his wagon had arrived at the west crossing thereof.

That, in the exercise of due care and caution, he stopped his horse and wagon and looked and listened for any car which might be then approaching said crossing; and that while thus looking he observed one of defendant's *steam trains* going over said crossing, and that " a certain *green* car of the defendant's, about seventy feet behind said steam train, was approaching said crossing." That he also observed " a certain other car of the defendant's, about seven hundred feet behind said green car. approaching said crossing."

That both of last named street cars were being propelled by electric force, and were being operated by the defendant's agents and servants.

That he " waited at said crossing until said *train of cars* and said *green* car passed over and away from said west crossing of said Carrollton avenue; and (he) looked and observed that the other car was a long distance away from said crossing, and that there was ample time for (his) horse and wagon to go over and beyond said crossing."

That, thereupon, he " did proceed to carefully drive and guide his horse and wagon over said crossing into said Carrollton avenue, plainly in sight of defendant's said servants and agents, who then and there had complete and absolute control of said car of defendant."

FIFTIETH ANNUAL REPORTS, 1898. 1089

Hemingway vs. New Orleans City & Lake Railroad Co.

The petitioner then avers that " then and there it became and was the duty of defendant's said servants to reduce the speed or motion of said car, and to prevent said car from running at a very high rate of speed, and (thus) prevent said car from running upon or against (his) horse and wagon; but defendant's said agents and servants, not regarding their said duty, wholly disregarding the presence of (his) said horse and wagon and (his) presence, and that of his sons in said wagon, * * * would not and did not reduce the speed or motion of said car, but permitted it to move on at its highest and greatest possible speed, until if ran upon and against the body of his said wagon with great force and violence," etc.

That in " consequence thereof (his) said wagon, and (he) and (his) sons were forced and driven with great violence from the point of impact over and upon defendant's cross-ties and rails, for a long distancet, o-wit, seventy feet; and then and there (his) said wagon was turned over and broken, and (he) and his sons were thrown with great force and violence upon the ground," etc.

That (his) " body was cut, torn and bruised; and his son, Ira, was thrown upon the ground and his body cut, torn and bruised; and his right arm cut, broken and crushed, and it became and was necessary to cut off and amputate (same)"—whereby said child is now and ever will be permanently maimed and disabled during his natural life.

That his " son George, was also thrown with great force and violence upon the ground, and his body cut, torn and bruised."

That he and his sons " suffered great pain and anguish, physically and mentaily," and that they " became and were sick and sore for a long time, to-wit.: forty days; and that it became and was necessary for him to pay and expend large sums of money * * * in the healing and curing his and his son's bodily injuries, etc."

The defendant first tendered a plea of no cause of action; and, simultaneously, it filed an answer, first pleading the general issue, and in the alternative, contributory fault and negligence on the part of the plaintiff, thus exonerating the company from all responsibility for the accident.

The exception was fixed for trial, submitted and overruled; and upon the statements we have extracted from the petition, we are of opinion same was correctly overruled.

As usual and necessary in this class of cases, the witnesses inter-

rogated were numerous, and their interrogation took a wide range; but the salient point, and most important question to be ascertained from the evidence adduced is, whether, from the distance of the car which caused the injury from the intersection of Canal street with Carrollton avenue where plaintiff's wagon was standing, the interval of time was sufficiently great to have justified his attempt to drive it across the track of the defendant, immediately in front and in full open view of it, rapidly approaching—the accident having occurred at about the hour of 3 o'clock in the afternoon.

The plaintiff's counsel recognized the fact that the obligation was legally imposed upon his client to look and listen for approaching trains or cars upon this highway of the city, when arriving at or near the intersection thereof with another street and before making an attempt to cross over same; and hence he was careful to make the statement in his petition that he stopped his horse and wagon near the street crossing so that one of the defendant's steam trains might pass by, and one of its electric cars likewise. That, having thus stopped, he did look, and saw another one of the defendant's electric street cars approaching him from the rear and apparently about seven hundred feet distant, and supposing that he had ample time to drive his wagon over the track with safety he attempted to do, and was overtaken and run down by said electric car—the servants and agents of the defendant operating and in charge of the car having ample opportunity to see him and his wagon, and ample time to have slacked the speed of the car so as to have avoided the collision, but they negligently failed to do so.

It is quite true that the public streets of a city are free and of equal access to all persons desiring to use them for either the purposes of business or pleasure, but neither has the right in making use of them to disregard the rights of others or to needlessly and causelessly imperil his own safety.

Between the parties there existed no contractual relations, and hence the defendant, in using and operating its electric cars, had imposed upon it only the duty with regard to strangers of observing *ordinary* care and caution. But that obligation rested equally upon the plaintiff.

A conspicuous fact in this case is admitted in the petition, and that is that plaintiff had brought his horse and wagon to a complete standstil, so as to permit one of the defendant's steam trains to pass

by, and also one of its electric cars; and that it was only after same had passed by that he attempted to drive across the track, in full view of the approaching car that caused the collision.

To accomplish this, the plaintiff had to put his horse and wagon in motion, after he had waited for the train to pass.

At this juncture it is well to make a brief synopsis of the testimony, and procure the aid of the witnesses in determining the question of doubt.

The plaintiff's witness, William Sundimaker—a boy of sixteen years of age, the driver of a milk cart—was immediately present at the place where the collision occurred, and saw the accident. He states that he was driving a two-wheeled milk cart, and had halted to pick up a boy and give him a ride. That he was standing on the Canal street bridge, at the intersection of Canal street and Carrollton avenue—the crossing next to the cemeteries. That, while standing there, he saw the steam train pass by, and then saw a green car pass by. That he saw the plaintiff standing there; and he waited for the dummy and the green car to pass by—both coming from the direction of the city. That he, also, saw a yellow car coming from the same direction; and when he first saw the green car it was over a block distant.

Being repeatedly interrogated on the subject, he said it was " over a block" distant from the crossing.

" Q. Now can you tell—give any general idea as to how far the yellow car was away, or located anywhere. If so, do so; tell the court.

" A. *When Mr. Hemmingway wanted to go across?*

" Q. *No; I mean when you first saw it?*

" A. *It was over a block.*

" Q. It was over a block?

" A. Yes, sir.

" Q. Now, tell the court, after you saw this dummy pass, how far was the green car, about, behind?

" A. About a half a block.

" Q. The dummy train when it passed? About how much did you say?

" A. About half a block, or three-quarters.

" Q. That is the block toward the city?

" A. Yes, sir.

" Q. How far away at that time was the yellow car?

" A. Well, it was about three-quarters of a block behind the green car.

" Q. When the dummy with its cars passed, had you or not seen Hemmingway in his wagon, or did you see him after?

" A. I saw him after the dummy passed.

*     *     *     *     *     *     *     *     *

" Q. Did you see him before the green car got up?

" A. Yes, sir.

" Q. When you saw Hemmingway where was his horse and wagon?

" A. His horse and wagon were standing on this side of Canal street.

" Q. On the lower side?

" A. Yes, sir.

" Q. Was it moving when you first saw it, or was it standing still?

" A. Standing still.

" Q. Did Mr. Hemmingway attempt to cross *before* the green car got up in front of him or *after?*

" A. Afterward.

" Q. How soon after the green car passed did he commence to cross?

" A. About fifteen feet.

" Q. Now, when Mr. Hemmingway—you saw him moving across— tell the court where the yellow car was then; about where it was?"

· To this question the witness states that it was just opposite the iron gate of a green cottage in the adjacent block.   .

The witness describes the collision thus:

" Well, when I stopped there was the dummy going past; and the dummy passed; and I saw Mr. Hemmingway stop then.   He was standing still there when the dummy passed, and then came the green car, and Mr. Hemmingway waited for that to pass.   I then saw the yellow car coming, and Mr. Hemmingway goes to go across, and the car came and hit him."

The witness says Hemmingway with his wagon was about fifteen feet from the car track when he started to cross over the street in the rear of the green car.   That his wagon was a spring wagon with four wheels and drawn by one horse.   He says the yellow car was about one hundred and seventy-five, or two hundred feet distant at that time.

He says " I looked around at the car.   I saw the car coming first, and I turned around and looked at Mr. Hemmingway."

He says another green car came up from the direction of the cemeteries just after the accident, and its motorman gave some assistance.

He says at the time Mr. Hemmingway was attempting to drive across the track his wagon was moving slowly and he was looking at the track.

The following occurred on cross-examination, viz. :

" Q.  Then according to your idea, Mr. Hemmingway didn't know that the car was coming?

"A.  No, sir.

" Q.  If he had looked in the direction in which it was coming he could have seen it, couldn't he?

"A.  Yes, sir; but he would have been too late to see it.

" Q.  Why do you say that?

"A.  It was too close on him.

" Q.  You mean too close to be stopped?

"A.  Yes, sir.

" Q.  When Mr. Hemmingway reached the track the car was too near to avoid striking him?

"A.  When Mr. Hemmingway started off the car was about the iron gate.

" Q.  Now you say it was too close to Mr. Hemmingway to help Mr. Hemmingway if he had seen it?

"A.  Yes, sir.

" Q.  You mean it was too close for the car to be stopped?

" A.  Yes, sir.

" Q.  So when Mr. Hemmingway got on the track the car was too near him to be stopped?

" A.  Yes, sir.

\*        \*        \*        \*        \*        \*        \*        \*        \*

" Q. And the car was coming along rapidly while Mr. Hemmingway was going on the track?

" A.  Yes, sir.

" Q.  And Mr. Hemmingway had not looked in the direction of the car?

" A.  No, sir.

" Q. And if he had looked in the direction of the car he could have seen it?

" A. He would have been too late to see it."

Another eye-witness of the accident disclosed in the course of his interrogation the following, viz.:

" Q. Now, will you be kind enough to tell the court what you saw; what is within your recollection?

" A. We (the witness and Mr. Dugue) were standing there talking (when) I saw this gentleman (the plaintiff) trying to go across. The dummy had passed. He looked like he was jerking his horse to cross; he was hurrying up; and the car that run into him was coming in such full speed Mr. Dugue said 'I don't think that he can make it. * * * and as he went to walk across the car ran into him."

This witness states that he was about one hundred and fifty feet from the place of the accident, on the down-town side of Canal street, on the side of the crossing toward the cemeteries. He said that the car which came into collision with the wagon "looked to him as though it ought to have been about one hundred and fifty (feet distant) or somewhere along there" when he saw the plaintiff crossing the track in his wagon.

He states that as the steam train passed going toward the cemeteries the plaintiff was slowing up his wagon.

" A. Yes, sir; he was slowing up a little as that (train) passed; and then, as the other car was coming on, he tried to get across. He was jerking his horse up."

" Q. Then, as I understand, the steam train passed just before he got to the corner; and then, after it had passed, he urged up his horse to go across?

" A. Yes, sir; that's my idea.

" Q. He didn't stop, did he?

" A. I didn't notice that; I wasn't paying much attention to him. He was hurrying up to get across when I saw him.

" Q. Just after the steam train passed?

" A. Yes, sir."

Another witness, who was standing near by on the up-town side of Canal street, gives a more complete description of the accident than the one whose testimony has just been detailed.

" Q. Tell the court what you know about it.

" A. I was standing on the up-town side of Canal street and I saw the dummy train going toward the cemeteries. After the dummy train passed I looked and saw Mr. Hemmingway on the down-town side of Canal street, on Carrollton avenue, and then came a green car.  *   *   *

" Q. Then came a green car from which direction?

" A. Following the dummy; the same way the dummy was going. After that came a yellow car; but between the time the green car passed and the yellow car came, Mr. Hemmingway made an attempt, by jerking his lines, to cross the track. Then the yellow car, it seemed to me, was like at the middle of the block, coming the same way the dummy and the green car did. Before Mr. Hemmingway could cross the track, the car had got about the middle of the block only before he got his cart across," etc.; that he saw the car when it struck the hind wheel of his wagon."

Again:

" Q. I understand you to say that you saw the dummy train pass?

" A. Yes, sir.

" Q. And after it passed, then you saw Mr. Hemmingway's cart?

" A. Yes, sir; after the dummy passed I saw his wagon.

" Q. Now, let us understand: on which side of Canal street were the horse and wagon?

" A. On the down-town side.

" Q. Now, was it moving or at rest?

" A. When the dummy was passing?

" Q. Yes.

" A. *The wagon was standing still when the dummy was passing; and, also, stood still until the green car passed.*

" Q. How soon after the green car passed, can you tell the court, did Mr. Hemmingway commence to drive his horse?

" A. As soon as the green car passed, he began to take his lines in his hands this way, as a driver will do, to try to cross the track.

" Q. Now, can you tell the court, if you know,  *   *   * where the yellow car was when Hemmingway took his lines and commenced to start?

" A. He was about the end of the block—just about coming into the block, like he was at the crossing."

He said the green car was about one hundred yards behind the

dummy when the latter passed over the crossing, and the yellow car was about one block behind the green car.

The witness, Dugue, gives a more concise description of the accident than either of the preceding witnesses, as will appear from the following, viz.:

" Q. Now, will you be kind enough to tell the court what you saw and when you saw it? * * *

" A. Yes, sir. I was on Carrollton avenue, on the woods side, between Customhouse and Canal, and I saw the car coming up; it was a yellow car. When I first saw the car it was *about two hundred feet off;* it was on the river side of Carrollton avenue. I saw a wagon going out Carrollton avenue, crossing the track. About that time—about the time he got on the track—the car struck him and dragged him about thirty-five feet."

This witness says he was about two hundred feet from the place of the accident; and after it had happened, assisted in carrying Mr. Hemmingway to the sidewalk.

Again:

" Q. When was your attention first attracted to Mr. Hemmingway's wagon?

"A. When the car was *about two hundred feet* off.

" Q. And where was Mr. Hemmingway's wagon when your attention was first attracted to it?

"A. Mr. Hemmingway ought to have been about *ten feet from the track.*

" Q. Was about ten feet?

" A. About that."

He says Mr. Hemmingway " was coming from the up-town side of Canal street to the down-town side of Canal street," immediately in front of him.

" He was on Carrollton avenue crossing Canal street," and the car struck his wagon about the middle and on the right side.

Again:

" Q. Well, when he was at a greater distance than ten feet from the crossing in which direction was he coming then?

"A. Well, he was in the position to cross the street to go to the lower side of Canal street. His horse was looking that way. Whether his horse was stopped or was just about to start I couldn't say."

Again:

"Q. On which side of Canal street was the wagon—up-town or down-town side?

"A. Down-town side.

"Q. Down-town side?

"A. Yes, sir.

"Q. Where was the horse's head directed?

"A. Toward Customhouse street. The wagon was toward Canal street and the horse's head was toward Customhouse street. He was either coming that way or he had stopped in that position—I couldn't say which.

Another witness, who resides on Carrollton avenue on the up-town side of Canal street, and within one hundred and fifty feet therefrom, states that he witnessed the accident from his dining room window and his statement is as follows, viz.:

"I could see two blocks away on Canal street from the window toward the city, or from the city toward the woods; and I was watching the cars, and I saw Mr. Hemmingway come along with a little spring wagon with two little children. And there was a dummy coming along, and he stopped at the corner of Carrollton avenue and Canal street, facing toward Carrollton avenue, to go out Carrollton avenue. And as the dummy passed there was a green car came by; and as the green car came by he started to cross the track. * * * *And I saw a yellow car coming rapidly on him when he started to cross.* And I said 'Will' to a friend of mine who was there with me—I said just 'Will, look!' and no sooner than I said that, the car struck the wagon."

The statement of the plaintiff is that he entered Canal street at Galvez street and "went out on the down-town side of Canal street to Carrollton avenue and came to a stop, as the steam train was about to pass. He waited until the train had passed; and he noticed a green car behind the train, * * * about one hundred and fifty or two hundred feet distant.

"Q. Did you observe another car?

"A. I did.

"Q. What kind of a car was that?

"A. It was a yellow car.

"Q. Well, now, give us your best judgment as to the distance at that time that the yellow car was behind the green car?

" A. Well, as the green car passed, or was passing, me I noticed that the yellow car hadn't got into the block behind me.

  *  *  *  *  *  *  *  *  *

" Q. When you came to Carrollton avenue what did you do?

" A. I came to a stop.

" Q. And when you came to a stop where were the passenger cars?

" A. *The train was passing me as I stopped.*

" Q. When did you move your horse forward?

" A. Immediately after the green car had passed."

He states that when he halted his horse and wagon his horse's head was directed toward Carrollton, and was *within six feet* from the down-town rail of the track of the railroad company—that is to say, that the distance from the horse's head was equal to one-half of the length of the horse and wagon, which he places at fifteen feet.

That he resumed motion "immediately after the green car passed" him.

He further says that " when he called his horse up his attention was directed to his horse to call him up. *As he called him up and got him in motion* (though he had seen the car before) the car that struck him had (reached a point) opposite an iron gate that is on Canal street; and that he has since measured the distance (and found it to be) just two hundred and twenty-five feet from the crossing. When he got his horse in motion he noticed that the car was that far away from him and coming rapidly," etc.

He states that the block in question is, by actual measurement, four hundred and eighty feet front on Canal street.

On cross-examination the following occurred, viz.:

" Q. Well, Mr. Hemmingway, the real cause of this accident, as I understand it, is that you attempted to go across this track while the car was rapidly approaching, and it got there before you crossed over?

" A. Yes, sir."

One of the defendant's witnesses, who was driving into the city from the cemeteries in company with his sister, stated that he was at the intersection of Canal street and Carrollton avenue, on the up-town side, and witnessed the accident.

That he noticed a man " evidently urging his horse to get ahead of an approaching car, and saw that a collision was inevitable from

the fact that he couldn't succeed in making the distance across. That he halted immediately abreast of it."

" Q. Where was he when you first saw him?

" A. He was at right angles with the road, crossing the intersection, urging his horse to go across before the approaching car. * * *

" Q. How far was he from the intersection when you first saw him?

" A. Well, he was, I suppose, * * * It was too sudden to figure on. Of course, he was right on the track, otherwise his horse could not have gotten across. He had gotten his horse across.

" Q. Have you any idea about how far from the track he was when you first saw him?

" A. Well, I should judge about a distance of fifteen or twenty feet.

" Q. A distance of about twenty feet?

" A. Yes, sir; driving up—hurrying up.

    *     *     *     *     *     *     *     *

" Q. How far was the car which collided with the wagon from the crossing where the wagon was struck, when you first saw it?

" A. I should judge one hundred, or one hundred and fifty feet— over one hundred and fifty feet approaching—approaching rapidly."

Again:

" Q. Now did you notice the motorman at all before the accident occurred?

" A. Yes, sir; I saw him braking his car.

" Q. You saw him put the brakes on the car?

" A. Yes, sir; braking his car—making every effort to stop it.

" Q. Before the accident occurred?

" A. Yes, sir.

" Q. You are certain of that?

" A. Yes, sir; I will swear it.

" Q. About how far off was he then?

" A. He was almost on to the wagon. He was using his efforts to stop it; of course he was trying to stop it."

He states that Mr. Hemmingway " was crossing from the lower side, going to the upper side, and the car was running toward the cemetery on the down-town side."

One witness testifies that he took Mr. Hemmingway's horse and wagon and placed them in the exact position in which his testimony assigns them—that is to say with the horse's head just six feet from

the down-town rail of defendant's track, and that on putting the horse in motion, he cleared the track with both horse and wagon in *nine seconds;* and in the course of several experiments he cleared the track once in *eight seconds.*

The same witness states that he has measured the distance from the iron gate, which is spoken of by the witnesses as being the position of the yellow car at the moment of time when Hemmingway started his horse, and ascertained the distance to the position the wagon was in to be two hundred and twenty-five feet. He also states that he has frequently since the accident timed the defendant's electric cars over the intervening space and ascertained that they covered same repeatedly in seven seconds.

By this means it is practically demonstrated that the possible difference in the relative time within which these two respective distances can be made by an electric car on the one hand, and the horse and wagon on the other, is only one and a half or two seconds.

The witness' conclusion as the result of this calculation is that the difference in speed is nine to one—that is to say that the horse and wagon would cover the space of twenty-five feet (the length of the horse and wagon) during the time the car would cover two hundred and twenty-five feet; that is to say, the car would cover twenty-five feet nine times to the horse and wagon once.

But the horse was at least six feet from the down-town rail of the track, and that distance should be added, thus making the true distance thirty-one feet—that is to say, a little less than one-fourth the distance the horse and wagon had to travel in order to clear the lower rail of the track, and this would require two additional seconds of time and thus necessitate a collision with the car. Nor is the slackened speed of the yellow car taken into consideration in this calculation.

In addition to the foregoing, the width of the track between the rails has not been taken into the account, and one second more would be required for the horse and wagon to clear the upper rail of the track.

Having gone over the evidence very carefully and made the foregoing copious extracts therefrom, we are constrained to say that the trend of it all is to sustain the judgment appealed from.

There are, of course, some inaccuracies of statement in the testimony of the witnesses: but that is a necessity of a case, the par-

ticulars of which are given by witnesses who profess to detail the circumstances of a collision that happened as quickly as an electric shock—the main point of difference between them being with regard to the distance of the yellow car, which caused the collision, from the horse and wagon at the moment the latter was first set in motion to cross the track.

But taking the estimates of Mr. Hemmingway as correct, that the car was two hundred and twenty-five feet away, and his horse's head only six feet from the down-town rail of defendant's track, the mathematical calculation of the witnesses demonstrates that a collision was inevitable unless the car could be stopped, and that seemed impossible.

The proof shows indisputably that the motorneer tried unavailingly to arrest the speed of the car. Having seen the horse and wagon at rest, there was no occasion for him to have made that attempt until after the horse and wagon was suddenly put in motion; and then the brief space of eight seconds was too short a period to render his efforts available.

The decisions to which the judge a quo referred are ample to support his decision.

Judgment affirmed.

Rehearing refused June 29, 1898.